## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION THREE

| | | |
|---|---|---|
| PATRICIA JONSON, | ) | |
| | ) | No. 33869-0-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SEARS, ROEBUCK & CO., a New York | ) | UNPUBLISHED OPINION |
| for profit corporation, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Patricia Jonson appeals the summary judgment dismissal of her personal injury claim against Sears, Roebuck & Co., arising from a hard fall sustained when she tripped over an ottoman left in an aisle in its Kennewick store. Ms. Jonson's testimony about the accident and that of her expert, a human factors engineer specializing in safety and risk management, raise genuine issues of fact. We reverse the order dismissing her complaint and remand for further proceedings.

### FACTS AND PROCEDURAL BACKGROUND

Because we are reviewing the dismissal of a claim by summary judgment, we view disputed evidence in the light most favorable to Patricia Jonson as the nonmoving party.

No. 33869-0-III
*Jonson v. Sears, Roebuck & Co.*

On the morning of January 10, 2012, 75-year-old Patricia Jonson traveled to the Sears store in Kennewick to look at I♥Comfort-brand shoes she had seen advertised in the morning's paper. She was familiar with where the shoe department was located in the store and on entering, walked down aisles in that direction. Upon reaching the shoe department, she saw an "I♥Comfort" banner hung above merchandise and continued down the aisle where it was located.

In response to an interrogatory posed by Sears, Ms. Jonson described what happened next:

> I did not look downward into that aisle. Both sides of the aisle had some sort of store cupboards or such on them. This was a side aisle, compared to a main aisle, in my estimation, but was intended for customer use. I had only taken a few steps into this aisle, my eyes still focused on my final destination, when I saw out of the left peripheral a swift glance at something blocking the aisle. I had no time to stop my progress, other than the thought ran through my mind, that I was going to fall.

Clerk's Papers (CP) at 25. The object blocking the aisle turned out to be an ottoman, later reported by Sears to be 14" wide, 28" long, and 18" high.

As she fell, Ms. Jonson reached out to brace herself, grabbing the ottoman. As she hit the floor, it rolled over with her. She came to rest against a cabinet on the side of the aisle, her legs tangled in the ottoman. She was stunned. A man helped her up and took her to the area of the shoe department where there were chairs, so she could sit.

After she sat down, a female employee came out from an employee area and asked her if she needed assistance. Ms. Jonson responded that she had fallen and needed a

2

moment to collect herself. When Ms. Jonson was ready, the employee helped her try on a pair of the I♥Comfort shoes, but Ms. Jonson chose not to buy them. She then went home.

Ms. Jonson had hit her "right shoulder, hip, elbow, knee, ankle, hand, and also the right side of [her] head" in the fall. CP at 25. She had her glasses on, and they cut her ear but did not break. Upon arriving at home she "wasn't feeling good," "felt shook up," and her "head was really hurting . . . a lot," so she went to bed. CP at 40-41.

The next day, Ms. Jonson "felt much, much worse":

> I felt so rotten, I didn't want to go out. I just wanted to stay home. I took a lot of Tylenol, you know. And by then, all the bruising started and all that kind of thing. So I kept ice on that.

CP at 41. Among other bruising, she had a black eye. She did not seek urgent care because she already had a regular physical exam scheduled for January 12.

Ms. Jonson called Sears at the opening of business on the morning of January 12 to speak with a manager about her fall and her concern about the safety of others. She spoke with the assistant manager of the Kennewick store, Ryan Seaver.

Later that morning, she went to see her doctor, Michael J. Pattillo, M.D., and told him about her fall. His dictation and report includes his notation at the outset of her history, "She fell 2 days ago. She wasn't watching where she was going. No head trauma. Still has bruising." CP at 45. Dr. Pattillo did not personally give her a referral

for physical therapy because, according to Ms. Jonson, "[h]e was sending me on, which I knew he would do, to another doctor." CP at 43.

Ms. Jonson sued Sears for negligence, alleging the ottoman blocking its aisle presented an unreasonable risk of harm to its business invitees and Sears should have expected that invitees would not discover or protect themselves from an obstruction existing below eye level. In response to discovery, she claims to have suffered not only the original trauma but to have continuing pain in her right knee; increased pain in her arthritic right wrist and thumb; neck stiffness and pain that requires occasional steroid injections and physical therapy; nystagmus;[1] and balance problems, dizziness, and lost stamina and strength. She claims approximately $15,000 in medical expenses, the largest items of expense being associated with physical therapy, and seeks general damages.

Following the conduct of discovery, Sears moved for summary judgment, arguing that "[a]n ottoman is not a dangerous condition"; that even if dangerous or hazardous, the ottoman was "completely open and obvious"; that Ms. Jonson had failed to show that Sears knew an ottoman in the aisle was dangerous; and that Ms. Jonson had not shown that it knew the ottoman had been moved into an unsafe position. CP at 8.

In opposition to the motion for summary judgment, Ms. Jonson submitted her own declaration and Sears' responses to discovery. In answering discovery seeking Sears'

---

[1] A vision disorder, one cause of which is injury to the head. *See* http://www.aao.org/eye-health/diseases/nystagmus-cause (last visited Sept. 14, 2016).

4

policies related to "clearing shopping aisles," "periodic inspections required during the course of the day to ensure there are no obstructions in any of the shopping aisles," or "inspection of aisles for obstructions prior to the opening of the store at the commencement of a business day," the only policy identified by Sears stated:

> Responsibility for maintenance and inspection of the premises is shared by store management, loss control and floor associates, with management and loss control associates responsible for the entire store premises and floor associates responsible for the department in which they are working. The premises occupied are inspected prior to opening and during public hours, inspected on an on-going basis by store management, lost [sic] control and floor associates.

CP at 62-64 (Interrogatories 4 through 6). In response to Ms. Jonson's request for "any logs, journals, or other periodic inspection reports related to aisle obstructions for January 10, 2012, in or around the department where Ms. Jonson suffered her injury," Sears answered, "Inspections are not timed, recorded, or scheduled." CP at 64.

Ms. Jonson also submitted electronic mail that Mr. Seaver sent to another individual after receiving Ms. Jonson's call on January 12. It stated:

> I was notified by customer Pat Jonson on Thursday 1/12/12 at approximatly [sic] 9am that she was victim of a slip and fall in the shoe department on Tuesday 1/10/12. She claimed to be quite badly injured and was going to need medical treatment. I asked Ms. Jonson if she notified anyone of her incident and she claims she did. She claims to have told an associate in the shoe department, but insists that she does not want to get that person in trouble.
> She also claims that she wants to have the item that she tripped on removed /repaired/replaced but declined to tell me what it was because she just wanted to "send me a report[.]" I informed Ms. Jonson that there was a process that we needed to follow in these situations and that would involve

5

her filling out an accident report and include any witnesses to the accident and her description of how it happened. She offered to type something up and I told her that we would be in touch with a copy of our accident report for her to fill out.

CP at 69.

Finally, and most importantly for purposes of this appeal, Ms. Jonson filed a declaration and report of Joellen Gill, a human factors engineering consultant specializing in safety and risk management together with color photographs of the ottoman that had been provided to Ms. Gill. Ms. Gill's curriculum vitae reflect a relevant educational history, numerous academic honors, relevant professional certifications, and over 20 years' experience as a human factors engineering consultant.

Ms. Gill's curriculum vitae and report reflect familiarity with industry practices, disclosing that she had "reviewed dozens of safety plans for retail stores" and was "quite familiar with the risk management practices of a wide variety of retail and governmental enterprises, including commercial, business, and retail establishments." CP at 79, 81.

They disclose her sources of information on Ms. Jonson's fall. Ms. Gill's declaration states she reviewed Ms. Jonson's deposition, the photographs of the ottoman, and Sears' diagram of its floor plan. It is clear from the report itself that she also reviewed Sears' discovery responses. *See* CP at 82 ("It is clear from Sears' Discovery Responses . . .").

6

Ms. Gill's report provides information on typical human behavior relevant to the

fall and its foreseeability:

> As people walk through their environment they typically do not look at the ground in the immediate vicinity of their feet. Rather, they look out at the "horizon", usually 25 feet or more ahead, and use visual cues for gross navigation. They usually rely on kinesthetic[2] and proprioceptive[3] cues to actually interact with the surface on which they are walking. This tendency is exacerbated in a retail setting with displays designed to capture the attention of the shopper.

CP at 78. Noting that Ms. Jonson had been looking up at an overhead banner as she

walked down the store aisle, Ms. Gill explained:

> When focusing our gaze out in front of us (i.e. or above us as in this case), our visual acuity rapidly degrades as we depart from the horizontal visual angle to the point where at a mere 20 degrees (i.e. 3 clicks of a second hand) we are considered legally blind.

CP at 78-79.

Ms. Gill acknowledged that "While we do engage in rapid eye scans (i.e. called

saccade) in our environment as we move about, we are searching for areas of information

or features of the environment that may have some importance to us." CP at 79. She

expressed the opinion that the ottoman was unlikely to be detected by a shopper whose

focus was elsewhere, reasoning, "Our eyes are naturally drawn to areas of information:

---

[2] "[O]f or relating to bodily reaction or motor memory." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1244 (1993).

[3] "[A]ctivated by, relating to, or being stimuli produced within the organism." *Id.* at 1819.

7

motion, blinking lights light contrast, color contrast[, y]et the subject ottoman was void of any such attributes." *Id.* The color photograph of the ottoman reveals that the color of its cover was almost identical to the color of the carpet in the shoe department.

As evidence that retail stores recognize the hazard posed by low-level obstructions, she pointed to her experience in reviewing retail safety plans, stating that retail stores

> consistently prohibit items on the sales floor less than 24 inches in height and in some cases less than 36 inches in height. For example the standard safety cone is transitioning from 24 inches tall to 36 inches tall. The reason for these precautions is the recognition that typical shoppers will fail to detect such a hazard in their peripheral vision when shopping in a retail environment with many distracting displays.

CP at 79.

As evidence that these principles about human walking and observing behavior have been recognized and applied to risk management for many decades, she cited illustrative treatises and industry standards dealing with safe walking surfaces. CP at 79-81. Pointing out that industry standards discourage one, two, or three riser steps in a walkway unless action is taken to make them conspicuous, Ms. Gill stated:

> The point to be made is that if people cannot reliably detect the height difference of a 3 riser step across the entire width of a walkway, they cannot be expected to detect an ottoman that is unexpected and in their peripheral vision.

CP at 81.

8

Finally, Ms. Gill explained how Sears' acts or omissions failed the Fundamental Principle of Safety, a three-tier process used by the safety and human factors profession to address known hazards. Under the first tier, or best alternative—"Safety by Design"— Sears should have "ensur[ed] the ottoman was placed correctly in an expected location when not in use, thereby eliminating the hazard by preventing the ottoman from being left in a narrow aisle." CP at 82. According to Ms. Gill,

> [T]he presence of the unexpected ottoman in the shoe department aisle violated a typical shoppers' mental model or "schema" about the world. That is, our expectation would be that while we see seats for sitting and trying on shoes, they are typically in the open area between displays or at the endcaps of shoe display aisles. It is atypical and therefore unexpected to find an ottoman in the center of an aisle between racks of shoes for sale.

CP at 81.

Ms. Jonson's deposition testimony was in accord. She testified that it was common to have ottomans in shoe departments in her experience, but "[t]hey aren't placed where this one was." CP at 40. And when asked if shoe stores even have ottomans on rollers that can be moved around by customers, she answered, "Really? I've never seen those." *Id.*

According to Ms. Gill, the required safety precautions recognized by the safety and human factors profession include proper training and enforcement of an effective safety plan. She expressed the opinion that "at the very least," Sears should have "provid[ed] a warning such as a bright safety yellow covering on the ottoman." CP at 82.

9

Finally, Ms. Gill observed that Sears recognized the importance to the safety of continual inspection as evidenced by its policy imposing responsibility on employees to inspect store premises "prior to opening and during public hours" and "on an on-going basis." CP at 63. Yet in her view, Sears' failure to impose an inspection schedule and recording requirement undercut the policy's effectiveness:

> While regular inspections are an important component of an effective safety program, they should be required on a regular basis, and such inspections should be recorded; without such implementation procedures it is impossible to ensure that such inspections are taking place as required, which is important for self-evaluation.

CP at 82.

In replying, Sears did not offer any conflicting expert opinion but continued to insist there were undisputed bases on which Ms. Jonson's claim could be summarily dismissed. It did submit a declaration of the individual who became the asset and profit protection manager at Sears' Kennewick store two years after Ms. Jonson's fall; he authenticated a photograph of the shoe department and fixtures at the store and testified that a review of claims files "shows that from at least 2005 on, there has never been a claim of injury in the shoe department of the Sears Kennewick store." CP at 103.

The trial court granted Sears' motion and dismissed Ms. Jonson's complaint. She appeals.

10

ANALYSIS

When reviewing a grant of summary judgment, we engage in the same inquiry as the trial court. *Marincovich v. Tarabochia*, 114 Wn.2d 271, 274, 787 P.2d 562 (1990). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). "The court must consider the facts in the light most favorable to the nonmoving party, and the motion should be granted only if, from all the evidence, reasonable persons could reach but one conclusion." *Marincovich*, 114 Wn.2d at 274.

"Negligence is generally a question of fact for the jury, and should be decided as a matter of law only 'in the clearest of cases and when reasonable minds could not have differed in their interpretation' of the facts." *Bodin v. City of Stanwood*, 130 Wn.2d 726, 741, 927 P.2d 240 (1996) (quoting *Young v. Caravan Corp.*, 99 Wn.2d 655, 661, 663 P.2d 834, 672 P.2d 1267 (1983)).

In order to maintain a general claim in negligence, a plaintiff must establish a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury that was proximately caused by the breach. *Crowe v. Gaston*, 134 Wn.2d 509, 514, 951 P.2d 1118 (1998). Injury and causation are not at issue on appeal. All that is at issue is whether the fact that the ottoman was placed or allowed to be placed in the aisle where Ms. Jonson fell breached a duty owed to Ms. Jonson.

11

At common law, a business proprietor owes a duty to invitees to make the premises reasonably safe. *Holm v. Inv. & Secs. Co.*, 195 Wash. 52, 59, 79 P.2d 708 (1938). In Washington, a proprietor breaches the duty and is liable for the harm caused by a physical condition on the premises where the proprietor,

> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
> (b) should expect that they will not discovery or realize the danger, or will fail to protect themselves against it, and
> (c) fails to exercise reasonable care to protect them against the danger.

*Iwai v. State*, 129 Wn.2d 84, 93-94, 915 P.2d 1089 (1996) (quoting RESTATEMENT (SECOND) OF TORTS § 343 (AM. LAW INST. 1965)).

Sears defends the trial court's summary judgment dismissal of Ms. Jonson's claim "because (1) the ottoman did not constitute a dangerous condition; (2) Sears had no actual or constructive knowledge of any dangerous condition; and (3) even if a dangerous condition did exist, such condition was open and obvious." Br. of Resp't at 5. It argues that on all these scores, as to which Ms. Jonson bears the burden of production, she "has not demonstrated any evidence supporting otherwise." *Id.* We address these suggested bases for affirming summary judgment in the order stated.

### *Knowledge of a Dangerous Condition*

> In contrast to what a licensee may expect, an invitee "is . . . entitled to expect that the possessor [of land] will exercise reasonable care to make the land safe for his [or her] entry". RESTATEMENT (SECOND) OF TORTS §

12

> 343, cmt. b. Reasonable care requires the landowner to inspect for
> dangerous conditions, "followed by such repair, safeguards, or warning as
> may be reasonably necessary for [the invitee's] protection under the
> circumstances." RESTATEMENT (SECOND) OF TORTS § 343, cmt. b.

*Tincani v. Inland Empire Zoological Soc'y*, 124 Wn.2d 121, 138-39, 875 P.2d 621 (1994)

(most alterations in original).

Ms. Jonson was entitled to expect that Sears employees had exercised reasonable care to provide safe aisleways. Even if we were to conclude that Ms. Jonson's lay testimony failed to raise a jury issue as to whether an 18" high ottoman blocking the aisle of the Sears store would be recognized as a dangerous condition, Ms. Gill's declaration and report serve as an expert opinion on that score. Sears responds by offering three arguments why Ms. Gill's declaration is inadmissible. None is persuasive.

Citing *Holmes v. Wallace*, 84 Wn. App. 156, 165, 926 P.3d 339 (1996), Sears argues that Ms. Gill's opinion is inadmissible because she did not conduct "field work," which it defines as witness interviews, site visits, physical inspections, accident re-creation, experiments, or tests. Br. of Resp't at 8. *Holmes* does not read any "field work" requirement into ER 702. Rather, it holds that if test- or experiment-like evidence is offered, it must be sufficiently relevant and reliable. *Holmes* involved an early morning auto-pedestrian accident, in which a point in contention was whether the defendant driver should have been using his high beam headlights. The defense wished to offer testimony from its experts that when they visited the location of the accident, they did not observe

13

drivers using high beam lights. The trial court excluded the evidence because their observations "did not occur at the same time of day or under the same conditions as the actual accident" and they were "unable to support this evidence with specific data." *Id.* at 165.

Sears does not show the information reviewed by Ms. Gill was insufficient to support her conclusion as to negligence. There is no "field work" requirement that her review and report fails to meet.

Sears next argues that Ms. Gill's opinions would not be helpful to a jury because the dangerousness of the ottoman is not beyond the average layperson's common knowledge. If so, then the case presents a jury question of negligence based on Ms. Jonson's lay opinion that Sears was negligent in placing an 18" high ottoman where it would block the center of an aisle. While laypersons might disagree, hers is not an unreasonable lay opinion. More importantly, Ms. Gill's report *does* provide specialized information that could assist jurors in determining whether Sears breached a duty. It qualifies as an admissible expert opinion under ER 702.

Finally, Sears argues that Ms. Gill's report cites industry standards that apply to walkways, not ottomans, and that the standards therefore have no relevance. We disagree. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. "The threshold to admit

14

relevant evidence is very low[; e]ven minimally relevant evidence is admissible." *State v. Darden*, 145 Wn.2d 612, 621, 41 P.3d 1189 (2002). Industry standards that address analogous safety issues arising from the same human behavior satisfy the low relevance threshold. The fact that the standards do not have direct application to ottomans goes to the weight of the evidence, not its admissibility.

We also note that even if Ms. Gill's discussion of the industry standards was excluded, her report would still contain enough observations about human behavior, risk management, and retail and commercial safety practices to create a jury question as to negligence.

### Actual or Constructive Knowledge

Sears next argues that Ms. Jonson fails to demonstrate that it had knowledge of the condition. A plaintiff can ordinarily establish knowledge of the condition at issue by showing either that the condition was caused by the proprietor or that the proprietor had actual or constructive knowledge of it. *Pimentel v. Roundup Co.*, 100 Wn.2d 39, 49, 666 P.2d 888 (1983). Sears contends it lacked knowledge, but its argument confuses knowledge of the condition with a distinct legal issue: it argues that it could not have known the ottoman might be *dangerous*. This argument does not pertain to whether Sears had notice of the condition, but rather to whether Sears should realize the condition involved an unreasonable risk of harm.

15

Sears offered evidence that its claims files for the Kennewick store only go back to 2005 and review of the claims shows that "from at least 2005 on, there has never been a claim of injury in the shoe department of the Sears Kennewick store." CP at 100, 103. Sears, a national retailer, cannot disclaim notice that low-lying items blocking aisles of a retail store present a hazard by relying on 10 years' history in the shoe department of a single store. We note that an annotation on personal injury claims such as this one includes eight reported decisions involving customers injured in Sears stores. Linda A. Sharp, Annotation, *Liability for Injury to Customer from Object Projecting into Aisle or Passageway in Store*, 40 A.L.R.5TH 135 (1996). In addition to those cases, see *Suriano v. Sears, Roebuck & Co.*, 117 Wn. App. 819, 72 P.3d 1097 (2003) (affirming the outcome of a Spokane jury trial on plaintiff's claim to have tripped over the base of a seven foot, four inch tall sign located in a nine-foot wide aisle). *Cf. Petey v. Larson*, 28 Wn.2d 790, 796, 183 P.2d 1020 (1947) (finding no contributory negligence as a matter of law where jury could find that boxes stacked next to a retail service counter over which plaintiff tripped had projected out into an aisle; "If this be so, the plaintiffs were entitled to go to the jury").

Here, there is no dispute that Sears knew the ottoman existed and where it was placed. Sears even states in its brief that the ottoman was "appropriately positioned,"

16

No. 33869-0-III
*Jonson v. Sears, Roebuck & Co.*

strongly implying that the ottoman was placed there by an employee. Br. of Resp't at 1.[4]

Clearly, Sears had knowledge of the condition.

### *Open and Obvious Danger*

Finally, Sears argues that if the ottoman was dangerous, it was open and obvious.

A proprietor will not be liable for the harm caused by an open and obvious hazardous

condition, unless the proprietor should anticipate that the condition may harm invitees

despite their knowing of it. *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 126, 52 P.3d

472 (2002). Ms. Gill states the issue from the perspective of a safety specialist:

> While it may have been "physically possible" for Ms. Jonson to detect the
> ottoman where she tripped and fell, the only relevant question in safety is
> whether a person could reasonably and foreseeably fail to detect the

[4] Sears' arguments that an ottoman is not a dangerous condition and that this ottoman was obvious also suggest it intended for the ottoman to be in the aisle:

> An ottoman . . . is exactly the type of thing one would expect to find in a
> shoe department in any store . . . . A place to sit and try on shoes is a
> necessary function of a shoe department. It could not offer the service it
> intends to provide without such accommodations. A chair, an ottoman or a
> bench are all completely ordinary furnishings that one would expect to
> encounter at a department store. . . .
>  . . . . The ottoman was in plain view in an area where the average,
> reasonable person would expect to find a seat or fixture of some kind. Not
> only is that type of fixture open and obvious in a department store, it is
> completely ordinary.

CP at 8-9. If Sears intended for the ottoman to be in the seating area of the shoe department but moveable by customers wishing to try on shoes in an aisle, then the self-service exception to the notice requirement, briefed by both parties, would appear to apply. In that event, Ms. Jonson need only show that given the self-service nature of the shoe department, the existence of unsafe conditions was reasonably foreseeable. *Pimentel*, 100 Wn.2d at 49.

17

unexpected ottoman, and not whether the ottoman was physically visible if a person was looking for such an unexpected hazard.

CP at 78.

Section 343A of the *Restatement* provides several illustrations of when a possessor of land can and should anticipate that a dangerous condition will cause physical harm to an invitee notwithstanding its known or obvious nature. Three involve retail store operations:

> 2. The A Department Store has a weighing scale protruding into one of its aisles, which is visible and quite obvious to anyone who looks. Behind and about the scale it displays goods to attract customers. B, a customer, passing through the aisle, is intent on looking at the displayed goods. B does not discover the scale, stumbles over it, and is injured. A is subject to liability to B.
>
> 3. The A Drug Store has a soda fountain on a platform raised six inches above the floor. The condition is visible and quite obvious. B, a customer, discovers the condition when she ascends the platform and sits down on a stool to buy some ice cream. When she has finished, she forgets the condition, misses her step, falls, and is injured. If it is found that this could reasonably be anticipated by A, A is subject to liability to B.
>
> 4. Through the negligence of A Grocery Store a fallen rainspout is permitted to lie across a footpath alongside the store, which is used by customers as an exit. B, a customer, leaves the store with her arms full of bundles which obstruct her vision, and does not see the spout. She trips over it, and is injured. If it is found that A should reasonably have anticipated this, A is subject to liability to B.

RESTATEMENT § 343A cmt. f.

Given the many reported decisions that impose liability for injuries caused to customers tripping over low-lying hazards in the aisles of retail stores, the *Restatement*

No. 33869-0-III
*Jonson v. Sears, Roebuck & Co.*

examples, and the information and opinions offered by Ms. Gill, a jury question exists as to whether Sears should have anticipated that an ottoman blocking a store aisle could cause physical harm to a customer notwithstanding its obvious nature.

We reverse the order dismissing Ms. Jonson's claims and remand for further proceedings.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Fearing, C.J.

19

33869-0-III

KORSMO, J. (dissenting) — As Ms. Jonson's doctor nicely summed up this case: "She wasn't watching where she was going." Clerk's Papers (CP) at 45. Ms. Jonson agreed with that sentiment: "I did not look downward into that aisle. . . . I had only taken a few steps into this aisle, my eyes still focused on my final destination, when I saw out of the left peripheral a swift glance at something blocking the aisle." CP at 25. Ms. Jonson even produced an expert who explained why she did not look where she was walking—her attention was drawn to a hanging banner that advertised the shoes she was seeking. After having conclusively established why she tripped over a visible object in her path, Ms. Jonson mysteriously faults Sears for the tumble.

Although establishing how she was distracted, her explanation does not indicate why the offending ottoman thereby was rendered invisible or unknowable. It does not appear the ottoman was colored such that it blended in with the floor or the cupboard it stood against. The ottoman was in the department where it belonged—the shoe department. Ms. Jonson, a veteran shopper, had experience with that particular Sears shoe department. She did not claim to be surprised by the presence of an ottoman in the

shoe department, an argument she might have been able to make if the fall had occurred in housewares or another department where customers do not need to sit in order to try on merchandise. Indeed, while she could remember a time when ottomans were not prevalent, she believed that "most stores" now had them. CP at 40. She also never suggested that in her experience it would be unusual for any merchandise or fixture to intrude on the aisles, or even that aisles existed solely for traversing the store.

In an earlier Sears trip and fall case, we characterized as "persuasive"[1] the decision in *Cudney v. Sears, Roebuck & Co.*, 84 F. Supp. 2d 856 (E.D. Mich. 2000), *aff'd*, 21 F. App'x. 424 (6th Cir. 2001) (unpublished). There a customer, also claiming to be distracted by displays, tripped over the base of a clothing rack that extended into the aisle. *Id.* at 857. Rejecting the distraction[2] argument, the trial court noted that it was

---

[1] *Suriano v. Sears, Roebuck & Co.*, 117 Wn. App. 819, 828, 72 P.3d 1097 (2003).

[2] In a further rejection of the distraction argument, the *Cudney* court noted that "a department store is not a sterile environment that provides public invitees a place to be free from visual stimuli; quite to the contrary, proprietors put items on display for the express purpose of drawing customers to them in the hope that the items will be purchased. Members of the public come to department stores precisely because things are on display, wanting to see the actual wares they may purchase. That, of course, is why Ms. Cudney was in the store. Clothing racks and the clothes upon them are part and parcel of that process. The rites of consumerism in no way obviate a consumer's obligation to watch where she is going. Even if Ms. Cudney had been distracted constantly by the clothing on display, her distraction would not have altered Sears' legal duty to her." 44 F. Supp. 2d at 860.

2

"clear from her testimony that she could have avoided coming into contact with the rack simply by watching where she was walking." *Id.* at 860. The condition was "open and obvious" as well as "completely ordinary." *Id.* at 861. Summary judgment was granted in favor of the store. *Id.* at 862.

Similarly here, the ottoman was "open and obvious" in the aisle. Indeed, Ms. Jonson did see it, albeit too late to respond. It also is "completely ordinary" to see an ottoman in a shoe department; even Ms. Jonson concurred in that assessment. Like the clothing rack in the aisle in *Cudney*, the ottoman in the shoe aisle in the Kennewick Sears was open and obvious. It could be seen by anyone looking to see it. The trouble here is that Ms. Jonson was not looking. Instead, she was transfixed on a sign a few aisles over and watched it instead of where she was going.

She had an obligation to see what was open and obvious.[3] She did not. Her distraction with Sears' marketing efforts does not change the nature of the ottoman's open and obvious presence in the shoe department, a place where one typically finds them. The majority opinion, unfortunately, focuses on an irrelevancy. The explanation

---

[3] In her trial court briefing, she described the opposing argument: "It is over simplistic for the Court to grant summary judgment simply because Ms. Jonson was not watching where she was walking." CP at 49. Like the trial judges here and in *Cudney*, I disagree. Her statement is not an answer to the argument that the condition was open and obvious. It simply is an attempt to shift the focus of the debate.

3

No. 33869-0-III
*Jonson v. Sears, Roebuck & Co. (dissent)*

of how and why Ms. Jonson ignored what was there to be seen is not an excuse for failing to see the ottoman. Sears did not hide the ottoman or otherwise disguise its presence. Tunnel vision does not present a jury question that excuses Ms. Jonson from seeing what was in front of her.

I respectfully dissent.

_____
Korsmo, J.

4