[No. 29987.   Department One.   August 28, 1947.]

JOHN W. PETEY et al., *Respondents*, v. MALLVIL A. LARSON et al., *Appellants*.[1]

*Metzger, Blair, Gardner & Boldt,* for appellants.

*Scott, Langhorne & McGavick* and *Patrick M. Steele,* for respondents.

ROBINSON, J.—The defendants in this cause operated a self-service grocery in Tacoma, Washington. Mrs. Petey

[1] Reported in 183 P. (2d) 1020.

lived in the vicinity and frequently traded at their store. In March, 1945, she fell, while on the premises of the defendants, and fractured her hip. This action followed.

From the photographs in evidence, it appears that the defendants' store is a large one, with very considerable floor space and modern fluorescent, overhead lighting. The walls are equipped with shelving, piled with canned goods and other merchandise, and there are numerous cases or counters, spoken of as "islands," throughout the room, also filled with merchandise, separated by aisles, some fifty-five inches in width, others, forty-six. Near the entrance are two parallel check-out counters. Transversely across the in-store ends of these counters is a service counter, eight feet in length, on which stand two scales, a cash register, and a coffee machine. Opposite this counter, and parallel with it, is an island of shelving displaying canned goods. The aisle between the service counter and the island is forty-six inches in width. Under the service counter and at each end thereof is a place for the storage of milk bottles. This storage can be reached from the aisles by stepping between the ends of the check-out counters and the service counter. All of the counters mentioned are thirty-six inches in height.

In the space enclosed, or rather almost enclosed, by these three counters, the clerks are stationed who check the customers' purchases, wrap or package them, and collect the purchase price. On the outside face of the service counter, there are kept at all times a stack or rank of empty strawboard boxes or cartons, piled in a single rank against the full length of the counter and, at times, higher than the counter itself. The checking clerks can step through the narrow opening between the ends of the checking counters and the service counter and readily procure these boxes for the convenience of customers who have made more purchases than they can conveniently carry in a paper bag. The boxes are not of uniform size, but, as we understand the testimony, the largest do not exceed a foot in width. When they are in place, the effect is much the

same as if the service counter was moved twelve inches toward the canned goods island, which would cut down the width of the aisle between them to thirty-four inches.

Mrs. Petey testified that she came into the store carrying some milk bottles and a shopping bag, and walked down the length of the checking counter to the opening between it and the service counter, intending to deposit the bottles under the end of the service counter. The box intended for bottles was full, so she rounded the corner and went down to the other end of the counter. In so doing, she passed along the row of boxes piled against the face of the service counter, went around the other end thereof, and left her bottles there. In retracing her steps, as she turned the corner of the service counter, she struck the bottom of the tier of boxes with her right foot. We quote from her testimony in chief:

"Q. Now, then, what happened when you got out into this aisleway? A. I hit the boxes and the next thing I knew I was on the floor. Q. With what did you hit the boxes? A. Well, I hit them with my foot as I stepped out into the aisle. I hit the boxes with my foot. Q. You hit the boxes with your foot, and what happened then? A. Well, the boxes just seemed to come right out in front of me, and I tried to grab hold of the boxes to support myself, but they were so light that there wasn't any support at all. I went down. Q. Had you seen the boxes before your foot struck them? A. I never noticed the boxes ever before."

She further testified that she observed the boxes after the fall:

"Q. How were they piled, Mrs. Petey? A. Well, there seemed to be big ones at the bottom, and then there seemed to be—well, they tapered up, one inside of the other. Q. Now, how high were the boxes piled, do you know, with reference to the top of the counter? A. Well, I should judge they were pretty close to the top of the counter. I can't just remember. Q. That is the top boxes? A. Yes, the top boxes. Q. And did you have an opportunity to look to see whether the lower one was out farther than the top one? MR. BOLDT: After the incident? MR. MCGAVICK: Yes. MR. BOLDT: Object to that, if Your Honor please. THE COURT: You may answer the question. A. I would judge

that the larger boxes did stick out, project out a little ways. That is why I happened to kick them."

On cross-examination, Mrs. Petey testified that she had lived in the vicinity a number of years and was quite familiar with defendants' store, but she saw nothing unusual about it on this particular day. She admitted that she walked down the eight-foot aisle between the rank of boxes and the parallel canned goods counter, but she said she did not notice the boxes:

"Q. They were there just like part of the counter itself? A. Just like part of the counter itself, yes. Q. And just like any other piece of fixture about the store, is that right? A. Yes."

She further testified, on redirect examination, as follows:

"Q. Will you state what part of your body came in contact with these boxes? A. Why, I hit my foot against the box. Q. What box did you hit? A. I hit the bottom one. Q. Was the bottom box larger or smaller than the other boxes? A. Larger, because one box was stacked inside of the other. Q. Did you see it when you were sitting there? A. When I sat there I had a chance to observe. I saw one box, a big box, at the bottom, and they were tiered up. Q. About how much bigger was the bottom box than the other boxes that were piled on top of it? A. Well, they just seemed to fit one inside of the other."

On recross-examination, she further testified:

"Q. You say that these boxes were fitted one into the other, is that right? A. Yes. . . . Q. Didn't you say the next one just fit into the bottom one? A. Well, I did not say it just fit, I said they fit inside. One seemed to fit inside the other. Q. How big a difference would you say there was in these boxes? A. Well, I could not say exactly just how much. Q. Well, would it be a matter of an inch or two? A. They are just packing boxes. One seemed to fit inside the other. Q. Maybe an inch or two difference in the size of the boxes, is that what you refer to? A. Pardon me? Q. I say, perhaps there was an inch or two difference in the size of the boxes? A. Well, they could be."

On redirect examination, as follows:

"Q. You say there could be an inch or two. I am asking could it have been more or was it more when you saw it?

A. I just never paid any attention to that at all. I know there was one box inside of the other. Q. You know there was one box—MR. BOLDT: Object to counsel—MR. McGAV-ICK: You will let me ask the question, I hope. MR. BOLDT: I don't want you to answer the question. Your statement now is not in the form of a question. MR. McGAVICK: Well, I am going to ask a few questions here, regardless of counsel. MR. BOLDT: You go right ahead, sir. MR. McGAVICK: All right. Q. (By Mr. McGavick) *Mrs. Petey, you do know that one box was larger, the lower box stuck out and was larger than the next? A. Yes.*" (Italics ours.)

We have quoted rather fully because it appears probable that, in attempting to prove that the bottom box was larger than the others, counsel had in mind the case of *Griffin v. Cascade Theatres Corp.,* 10 Wn. (2d) 574, 117 P. (2d) 651. Keeping in mind that the boxes were nearly of uniform size and that Mrs. Petey did not see them until they had fallen into the aisle, it would seem that her conclusion that the lower box protruded was more or less in the nature of a speculation rather than a statement of an observed fact. In her testimony in chief, she said:

"I would judge that the larger boxes did stick out, project out a little ways. That is why I happened to kick them."

The trial court showed a strong tendency towards granting the defendants' challenge to the evidence at the close of plaintiffs' case, which viewpoint was apparently based upon the fact that the evidence did not show that defendants had done anything different from that which ordinarily reasonable merchants were accustomed to do, and that all the conditions of the place were within the observation of Mrs. Petey.

The questions for our decision do not require a discussion of the evidence adduced by the defendants.

Mrs. Petey was very gravely injured. Two hip operations were required. In one, the fracture of the femur was got at through an incision in the vicinity of the hip joint, and in the other, the fracture was approached through an incision in the lower abdomen. Mrs. Petey was in the hospital for many weeks, and more than a month in a con-

valescent home. At the time of the trial, she was unable to bear her weight on her left leg and had to get around either in a wheelchair or use crutches, and had to be helped in and out of bed. Her physicians testified that, at her age (sixty-eight at the time of the trial), she could not expect to resume her normal functions in less than two or three years.

Mr. Petey detailed the expenses connected with his wife's injury. The figures he gave were not questioned, nor was he even cross-examined. The total amounted to $1,614.84. The jury returned a verdict for $1,614.84, and no more. On the day following the return of the verdict, the defendants filed a motion for judgment notwithstanding, on the ground that they were entitled to such a judgment as a matter of law. On the day following, the plaintiffs filed a motion for a new trial, assigning the following grounds:

"(1)   That the damages are so inadequate as unmistakable to indicate that the verdict must have been the result of passion or prejudice.

"(2)   Error in the assessment of the amount of recovery.

"(3)   Error in law occurring at the trial and excepted to at the time by the plaintiffs."

On March 14th, the trial judge entered an order reciting that he had heard the argument of counsel on their respective motions, and ruled as follows:

"Now, Therefore, It Is Hereby Ordered that the motion of defendants for judgment notwithstanding the verdict in the above entitled cause be and the same is hereby overruled and denied.

"It Is Further Ordered that the motion of plaintiffs for a new trial of the above entitled cause be and the same is hereby sustained and granted.

"The defendants' exception to this order and each and every part thereof is hereby allowed."

Defendants appealed from the whole of the above order and every part thereof. There are, therefore, three dispositions which may be made of this case, (1) direct judgment for the defendants; (2) direct judgment on the verdict, or (3) hold that the new trial was properly granted.

We do not know upon what theory the trial court granted a new trial. Certainly, it could not have done so on the ground that the damages arrived at were so inadequate as to unmistakably indicate that the verdict must have been the result of passion and prejudice. There is not a single thing or circumstance in the record which would tend to create or instill passion and prejudice against the plaintiffs in any normal person.

We do not think that the record shows contributory negligence as a matter of law. As to primary negligence, it is apparent that there must have been some members of the jury who earnestly believed that negligence was shown. Vague as the evidence on the point is, it may be possible for reasonable men to believe that the foundation box of the tier projected out into the aisle. If this be so, the plaintiffs were entitled to go to the jury. If the plaintiffs were entitled to a verdict at all, they were clearly entitled to a larger verdict than they received. A judge who presides at the trial of a case is in a much better position than a reviewing court can be in determining whether a new trial should be granted. We cannot say that the trial judge in this case abused his discretion.

The order appealed from will stand affirmed.

MILLARD, JEFFERS, and SCHWELLENBACH, JJ., concur.

SIMPSON, J. (dissenting)—The motion for judgment n.o.v. should have been granted. I therefore dissent.

---

October 8, 1947. Petition for rehearing denied.