# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>Respondent,<br><br>v.<br><br>DANNIE CHRISTOPHER BRASHEAR,<br><br>Appellant. | No. 86610-9-I<br><br>DIVISION ONE<br><br>OPINION PUBLISHED IN PART |

BIRK, J. — Dannie Brashear appeals his conviction, arguing, among other things, that the trial court violated his constitutional right to confer with counsel where he appeared at all pretrial hearings remotely, while his defense counsel was at a different location. In the published portion of this opinion, we hold that Brashear did not object to this arrangement in the trial court and cannot raise this issue for the first time on appeal because he cannot show manifest error as required by RAP 2.5(a)(3). For this reason, and those discussed in the unpublished portion of this opinion, we affirm Brashear's conviction and remand to strike the victim penalty assessment (VPA) and community custody supervision fees.

I

On November 18, 2021, the State filed an information in superior court charging Brashear with several criminal counts arising out of alleged altercations

with an intimate partner.  Brashear appeared remotely via Zoom[1] from the jail for each of his pretrial hearings, while defense counsel appeared from a location different from him.  Brashear did not object to appearing remotely at any of the hearings.

Brashear's first appearance occurred on December 2, 2021.  The trial court found probable cause existed for the charges and appointed counsel for Brashear.  The State requested, and the trial court agreed to, $500,000.00 in bail.  The trial court placed Brashear in a waiting room[2] for "a few minutes" while the conditions for release and the no-contact order were being prepared.  Defense counsel asked to be placed in the same waiting room, which the trial court stated it could not do.[3]

At Brashear's arraignment, Brashear pleaded not guilty and the trial court set dates for trial and an omnibus hearing.

On December 17, 2021, the trial court went on the record to note that a motion hearing had been moved to the following week.

On December 23, 2021, the trial court held a hearing for Brashear's motion to reduce bail to $100,000.00.  Through counsel, Brashear argued that he had a

---

[1] "Zoom" is a cloud-based videoconferencing software platform.
[2] A Zoom "waiting room" is a virtual staging area that prevents people from joining a meeting until the host is ready.  *Secure Your Meetings with Zoom Waiting Rooms*, ZOOM BLOG, https://www.zoom.com/en/blog/secure-your-meetings-zoom-waiting-rooms/?cms_guid=false&lang=en-US (last visited Oct. 15, 2024).
[3] Brashear does not clearly argue on appeal that this exchange amounted to an objection to use of the remote platform.  Brashear raises it as evidence that he lacked the ability to continuously confer with counsel.  When Brashear was asked to wait while the trial court completed paperwork, his newly appointed counsel asked for the opportunity to confer.  The record indicates that a breakout room was not available because the jail was "pushing through."  The exchange does not indicate that the remote platform did not allow breakout room capability.

2

two year old child for whom he was obligated to pay child support, he tested positive for COVID-19 at the jail and "[h]e'd like to get out of there," he had an open labor and industries claim that he could not prosecute from the jail, and he had limited funds secured to assist in the payment of the bail bond. The State objected to any reduction of Brashear's bail, and the trial court denied the defense's motion.

At the January 12, 2022 omnibus hearing, the State noted that "the parties are in agreement to set it over to next week." Defense counsel indicated he had "talked to [Brashear] about this," and the court continued the hearing.

On January 21, 2022, the trial court held the rescheduled omnibus hearing, where the parties confirmed they had exchanged omnibus packages.

On January 25, 2022, the trial court held a hearing for defense counsel's motion to continue. After determining the parties were within Brashear's speedy trial deadline, the trial court reset trial for April 18, 2022.

On February 4, 2022, the trial court held a hearing for Brashear's motion to allow him access to the law library, for which Brashear was not present. The State had no objection and the trial court granted the motion.

On March 16, 2022, a hearing was held on Brashear's motion for substitution of counsel. The trial court allowed the substitution and confirmed it would not change any trial dates.

On April 14, 2022, the trial court held a readiness hearing. Brashear's new defense counsel noted she and the State agreed on a new trial date, but could be ready "only if the motion to sever is granted." The State requested a continuance to review the motion to sever and noted it also could not be ready without knowing

the court's ruling on the motion. Brashear stated, "I would like to move forward with my trial on Monday, but I believe it's best if we could sever it." The trial court continued trial to May 2 and set a new readiness hearing.

On April 21, 2022, the trial court held a second readiness hearing. Defense counsel requested a continuance to review additional discovery she had received, and noted on the record she had conferred with Brashear, "We have discussed it at length. He knows what the Court's position is and I think the Court can find good cause, based on the fact that I have not reviewed all of the discovery in the matters." After hearing from the State and Brashear, the trial court continued trial until June 21, 2022.

On May 13, 2022, the trial court held a hearing regarding the pending trial date. The State explained a witness was not available for the June 21 date because he would be in military training, and asked to advance the trial date to May 23. Brashear confirmed he did not object to moving up the trial date. The trial court granted the State's request.

II

Brashear argues for the first time on appeal that his constitutional right to privately confer with counsel was violated where he appeared at these pretrial hearings by videoconference while his defense counsel was in a different location. We hold that Brashear cannot raise this issue for the first time on appeal because he cannot establish manifest error under RAP 2.5(a)(3).

Under both the Sixth Amendment and article 1, section 22 of the Washington constitution, a criminal defendant is entitled to the assistance of

counsel.  State v. Heng, 2 Wn.3d 384, 388, 539 P.3d 13 (2023).  The right to counsel attaches at a defendant's " 'first appearance before a judicial officer' where 'a defendant is told of the formal accusation against him and restrictions are imposed on his liberty.' "  Id. at 389 (quoting Rothgery v. Gillespie County, 554 U.S. 191, 194, 128 S. Ct. 2578, 171 L. Ed. 2d 366 (2008)).  The right to counsel requires defendants to have the ability to confer meaningfully and privately with their attorneys at all critical stages of the proceedings.  State v. Anderson, 19 Wn. App. 2d 556, 562, 497 P.2d 880 (2021).  "[A] critical stage is one where a 'defendant's rights were lost, defenses were waived, privileges were claimed or waived, or in which the outcome of the case was otherwise substantially affected.' "  Heng, 2 Wn.3d at 394 (internal quotation marks omitted) (quoting State v. Heddrick, 166 Wn.2d 898, 910 n.9, 215 P.3d 201 (2009)).

Case law distinguishes between the defendant lacking any legal counsel at a hearing, and the defendant having counsel but lacking the ability to confer meaningfully and privately during the proceedings.  See State v. Dimas, 30 Wn. App. 2d 213, 219, 544 P.3d 597 (2024).  The Supreme Court has held that the absence of counsel from a hearing that is not a critical stage is subject to constitutional harmless error analysis.  Heng, 2 Wn.3d at 393-94 (citing Satterwhite v. Texas, 486 U.S. 249, 257, 108 S. Ct. 1792, 100 L. Ed. 2d 284 (1988)).  And this court has held that where counsel is present, a deprivation of the right to meaningfully and privately confer even at a critical stage is subject to constitutional harmless error analysis.  Dimas, 30 Wn. App. 2d at 219-20 (contrasting State v. Heddrick, 166 Wn.2d 898, 910, 215 P.3d 201 (2009) (discussing complete denial

5

of counsel) and State v. Bragg, 28 Wn. App. 2d 497, 512, 536 P.3d 1176 (2023) (applying constitutional harmless error to deprivation of the ability to confer at critical stages)).[4]

Brashear did not object in the trial court that appearing remotely violated his right to privately confer with counsel. RAP 2.5(a)(3) states that a party may raise for the first time on appeal a "manifest error affecting a constitutional right." This rule is intended to allow a reviewing court to correct any "serious injustice to the accused" and to preserve the fairness and integrity of judicial proceedings. State v. McFarland, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995). To determine the applicability of RAP 2.5(a)(3), we inquire whether (1) the error is truly of a constitutional magnitude, and (2) the error is manifest, meaning the appellant can show actual prejudice. State v. J.W.M., 1 Wn.3d 58, 90, 524 P.3d 596 (2023). To demonstrate actual prejudice, the appellant must make a plausible showing that the claimed error had practical and identifiable consequences in the trial of the case. Id. at 91. In determining whether the error was identifiable, the trial record must be sufficient to determine the merits of the claim. State v. Kirkman, 159 Wn.2d 918, 935, 155 P.3d 125 (2007). "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." McFarland, 127 Wn.2d at 333.

---

[4] When a defendant lacks any counsel at a critical stage of the proceedings, the Washington Supreme Court has called this structural error requiring automatic reversal. Heng, 2 Wn.3d at 392.

Here, the deprivation of the right to confer with counsel is a constitutional claim. Thus, the question turns on whether Brashear has established manifest error.

This showing becomes more difficult when the claim is that a criminal defendant was unable to confer with counsel at a proceeding that was not a critical stage. Since critical stages in general include those "where the outcome of the case was otherwise substantially affected," Heng, 2 Wn.3d at 394, it follows that limitations on conferring with counsel at other hearings are less likely to result in " 'practical and identifiable consequences in the trial of the case' " under RAP 2.5(a)(3), J.W.M., 1 Wn.3d at 91 (internal quotation marks omitted) (quoting State v. O'Hara, 167 Wn.2d 91, 99, 217 P.3d 756 (2009)). Brashear does not attempt to demonstrate that any of the hearings at issue were critical stages. Brashear's first appearance and arraignment were not critical stages for purposes of the right to counsel. See Heng, 2 Wn.3d at 395. The remaining proceedings were two motion hearings for bail reduction, two omnibus hearings, a motion to continue trial, a motion to allow Brashear access to the law library, a motion for substitution of counsel, two readiness hearings, and a motion hearing to move the trial date forward. At these hearings, Brashear "lost no rights, waived no defenses, and neither claimed nor waived privileges." Id. His challenges to the bail amount were denied, but he did not "lose his ability to challenge bail." Id.

We additionally look at the content of the hearings in considering whether any limitation on conferral resulted in actual prejudice having practical and identifiable consequences in the trial of the case. At the December 17 hearing, the

7

trial court went on the record only to learn the hearing had been moved to the following week. At the December 23 hearing, Brashear's counsel argued for bail reduction and listed multiple reasons why bail should be reduced. It is clear from the reasons presented that Brashear had had ample opportunity to confer with counsel. There is no indication that consultation with counsel during the hearing would have changed the outcome of the motion and Brashear makes no attempt to show that any alleged deprivation affected the trial that occurred five months later. The omnibus hearing was agreed, and the motions for law library access and substitution of counsel were granted in Brashear's favor. Brashear does not show how the ability to confer at these hearings could have affected them, let alone the subsequent trial.

The remaining hearings concerned the trial date. The trial court granted trial continuances despite Brashear's refusal to waive his speedy trial right. But the trial court had legitimate reasons for granting the continuances, Brashear informed the court of his objections, in at least one hearing Brashear's counsel noted on the record the fact of having conferred with Brashear, and the last hearing resulted in trial being moved to an earlier date, where defense counsel invited Brashear to provide his input, revealing that Brashear supported the court's action. There is no indication that Brashear's ability to confer with counsel during the hearings would have changed any result. In addition, Brashear gives no reason that *when* trial occurred affected the outcome of this case.

Brashear cites Bragg in support of his argument that a trial court has an affirmative duty to provide guidance on how a defendant can privately confer with

counsel regardless of whether the record permits review of the issue.[5]  Brashear mischaracterizes Bragg.  In Bragg, the State conceded that it was manifest error affecting a constitutional right for the defendant to participate in all pretrial hearings by video while his attorney appeared in court.  28 Wn. App. 2d at 504 n.5.  The court accepted review under RAP 2.5(a)(3), but cautioned, "[W]e do not hold that every such deprivation satisfies RAP 2.5(a)(3).  Manifest error must first be found." Id. at 504 n.5.  We explained there was no "bright-line rule that a trial court affirmatively must establish a process on the record for confidential attorney-client communication, or it commits a constitutional violation," and instead held that "reviewing courts should consider the totality of the circumstances, *including* whether the trial court explicitly established a process for such communications, given the variety of different circumstances that may occur."  Id. at 507.  In other words, the trial court's accommodation for private conferral is merely one factor relevant to assessing whether an error is manifest.  This factor does not aid Brashear, because despite his asking us to infer he was unable to confer with counsel, the record is silent on whether the trial court's videoconferencing platform allowed that capability.

In contrast, in Bragg, during at least four critical stage proceedings the trial court provided no guidance about how to privately confer and explicitly refused to

---

[5] Brashear also cites State v. Schlenker, but in that matter the appellant preserved error by objecting to the use of videoconferencing in the trial court.  31 Wn. App. 2d 920, 553 P.3d 712, 725 (2024).

answer Bragg's question about how to confer with his counsel.[6] Id. at 506, 510-11. The court applied the constitutional harmless error standard and held it could not know beyond a reasonable doubt whether the outcome of the case would have differed if the defendant had been able to have his attorney's confidential assistance during the four critical stage hearings. Id. at 512, 516. The substance of the hearings appeared to have been significant to the outcome. They were a review hearing discussing a plea offer, a hearing discussing Bragg's request to discharge counsel, and two hearings discussing DNA evidence and the potential need for additional expert testimony at trial. Id. They included plea discussions, and we could not exclude reasonable doubt about whether conferral might have led to a plea bargain hundreds of months shorter than Bragg's ultimate sentence. Id. at 512-13. These were matters significant to the trial, and occurred in a context where it was apparent that Bragg and his counsel had severe difficulty communicating. Id. at 513-14. The lack of the ability to privately confer thus appeared to significantly impact hearings whose outcome shaped the trial.

Brashear does not show how communication with counsel at any of the pretrial hearings in his case could have affected the trial. He therefore fails to show manifest error affecting a constitutional right under RAP 2.5(a)(3) and we decline to reach this claim of error.

---

[6] Bragg repeatedly alerted the court to his desire to confer with counsel and his inability to do so, therefore it is not clear that Bragg is properly viewed as a case in which objection was not made in the trial court.

We have determined that the remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. See RCW 2.06.040.

UNPUBLISHED TEXT FOLLOWS

Brashear additionally argues (1) the trial court violated his right to a fair trial in admitting multiple references to his criminal history, (2) the State engaged in prosecutorial misconduct, (3) Mourer did not have actual authority to consent to officers' warrantless entries into Brashear's property, (4) cumulative error occurred, (5) the trial court failed to follow the procedural requirements of the mental health sentencing alternative (MHSA) statute, RCW 9.94A.695, (6) the trial court erroneously imposed the VPA and community custody supervision fees, and (7) numerous additional issues raised in a statement of additional grounds.

III

The State alleged that on October 26, 2021, October 30, 2021, and November 9, 2021, Brashear assaulted his girlfriend, Jenny Mourer. The State charged Brashear with second degree assault, harassment, two counts of fourth degree assault, third degree malicious mischief—all with domestic violence designations—interference with reporting of domestic violence, and first degree unlawful possession of a firearm. In the State's case, Clark County Sherriff's Deputy Michael Gonzalez testified an incident occurred on October 27, 2021 at around 2:00 a.m., where a female called and said her head was bleeding and she wanted an ambulance.

Deputy Gonzalez testified Mourer ran down the hill and "had blood coming down from the top of her head. And she also had lacerations on her, I believe it was right arm and wrist area." The deputy testified that Mourer told him "that her boyfriend or at the time, [Brashear] were arguing over her mom calling her and that she got hit over the head with a hard object and she didn't know what it was." After taking photos of Mourer, Deputy Gonzalez walked her down to the ambulance. Officers then went up to the residence to search for Brashear using a K-9 unit, but could not locate him. Mourer testified she and Brashear began dating sometime after February 1, 2021, and stopped dating October 26, 2021 because "that's the day [Brashear] assaulted" her. Mourer testified that she "got knocked off the truck. I was sitting on the back of the truck. And . . . either he punched me or kicked me. I don't remember which came first, but I remember I flew off the back of the truck and I got knocked out." Mourer testified Brashear hit her with his fists and "a tool bag that had two drills in it." Mourer testified she sustained a "collapsed lung on my left side and I had fractured ribs and I had to get stiches on my arm and staples in my head." Medical witnesses at trial verified these injuries from the October 26-27, 2021 incident.

Mourer said she left the hospital on October 30 and Brashear picked her up and took her back to his house. Mourer testified that back at the house, she "got hurt again" and "got punched off the toilet." Mourer was punched in the face and testified that she tried to defend herself by grabbing "whatever I could around me and I was laying on my bag and I just started throwing shit, stuff." Mourer testified

Brashear threatened her life, and told her "it was either me or him," meaning "[o]ne of us was gonna die."

Deputy Gonzalez arrived at the property on October 30 and assisted Mourer with gathering her belongings and walked her down the driveway to the ambulance where she was transported to the hospital. Deputy Gonzalez testified he searched the property looking for Brashear, and during his search found a "revolver" located "on a bench outside of the vacant home."

Brashear testified that his relationship with Mourer turned bad "almost immediately" and during arguments she would strike him. On October 26, just after midnight, the two were arguing in the garage when Mourer picked up Brashear's drill bag and swung it at him. Brashear responded by pushing Mourer off to the side, causing her to fall onto the hitch of the truck. According to Brashear, as he pushed Mourer, the beer bottle in his hand fell to the ground and broke. Brashear testified, "I believe she fractured two of her ribs on her left side and then she rolled over and was dazed, and she had mentioned yesterday that she ran her forehead into the exhaust pipe of the truck." Mourer then fell into the glass from the broken beer bottle, "[a]nd then, when she was getting back out from under the truck, she was pushing herself" up, causing her to cut her arm. Brashear explained that there was blood "all over the door and on the refrigerator" because he helped Mourer up and took her into the main house. The two then made the decision to call 911 and Brashear helped her into the ambulance that night. Afterwards, Brashear went back into the house and went to sleep.

Brashear testified that he picked Mourer up from the hospital and brought her back to his house, where the two began arguing later that evening. Brashear testified Mourer "said that she was gonna call up an ambulance and tell them that her lung was collapsing, so that she could get off the property." Brashear helped Mourer carry her things down to the property line at the bottom of the driveway.

The State dismissed the interference with reporting of domestic violence charge before the case was submitted to the jury. The jury acquitted Brashear of harassment, both counts of fourth degree assault, and third degree malicious mischief. The jury found Brashear guilty of second degree assault and unlawful possession of a firearm, and found that Brashear and Mourer were intimate partners.

At sentencing, the trial court imposed the VPA fee, and waived all other non-mandatory legal financial obligations. Brashear asked for a MHSA because of his history as a "severe alcoholic." The trial court denied Brashear's request and stated,

> I look at this case and what is bothering me is or what I'm having trouble with is the argument that alcohol is the primary problem here. It's a bit, in this Court's view of saying that fuel is a danger and fuel is a problem. Well, if fuel is only a danger to or explosive when there's an underlying flame or ignition or something that could start it. So, obviously, alcohol is a lifelong struggle and condition here, but what's more bothersome to the Court is a pattern of behavior, not just in this case, but perhaps previously.
>
> But what I'm seeing here and what I remember from the case was a pattern of a certain amount of grooming and predation upon this particular victim. It's hard to imagine a more vulnerable victim or a fact pattern presentation that demonstrates a particular vulnerability.
>
> As I recall, you found her at a gas station in Battleground with a child in February alone and in the rain. Took her into his property

14

out in North County. You see patterns of isolation and financial dependence and other dependence on him. I don't think that's accidental. I don't think that can be explained by alcohol over the course of eight or nine months when we get into October and November with these alleged incidents occurred.

I think this was all whether intentional or subconscious, an effort to groom and put this person in a position of complete dependence. And I think when the Court stands at the zenith of its authority and power is when it's protecting those that are vulnerable in the community.

Brashear appeals his conviction.

IV

Brashear argues the trial court violated his right to a fair trial in failing to sustain objections and strike testimony where multiple witnesses testified about Brashear's criminal history and prior imprisonment.[7] We disagree.

We review the trial court's cure of irregularities, such as improper testimony, for an abuse of discretion. State v. Post, 118 Wn.2d 596, 620, 826 P.2d 172, 837 P.2d 599 (1992). "When a trial court's exercise of its discretion is manifestly unreasonable or based upon untenable grounds or reasons, an abuse of discretion exists." State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995). "To determine the prejudicial effect of an irregular occurrence during trial, we examine the occurrence's seriousness, whether it involved cumulative evidence, and whether the trial court properly instructed the jury to disregard it." State v. Thompson, 90 Wn. App. 41, 46, 950 P.2d 977 (1998).

---

[7] The State argues we should decline review of this issue because Brashear fails to assign error to the trial court's decision on the motion for mistrial and analyzes his claim only within that context. Brashear assigns error to the witnesses' references and argues the issue in his analysis. Brashear has properly raised the issue on appeal.

15

Before trial, the parties stipulated that Brashear was previously convicted of an offense. Brashear moved to exclude evidence of his prior bad acts, and the trial court stated if such evidence was to be elicited, "it should be done with an offer of proof outside the presence of the jury." Brashear argues that there were five instances where witnesses provided testimony that violated the court's order as to the ER 404(b) evidence that was addressed during motions in limine.

First, when asked how he generally executes a warrant, Clark County Sheriff's Deputy Zachary Nielsen testified, "Every time that we do a search warrant, we do a risk assessment, which would lead us to totaling points based upon criminal histories, access to weapons, that kind of thing," and "for this incident we had SWAT serve the warrant based upon the risk to deputies." Brashear objected based on non-responsiveness, which the trial court overruled.

Second, Deputy Gonzalez testified he knew Brashear had "a criminal history." Outside the presence of the jury, Brashear asked the trial court to strike that comment. The trial court stated there was no prejudice to Brashear and refused Brashear's request to instruct the jury to disregard the testimony because it would have drawn unnecessary attention to the issue.

Third, the State asked Deputy Gonzalez to identify Brashear, to which Brashear objected for lack of foundation. The State attempted to establish foundation:

Q     Have you seen Mr. Brashear before?

A     In person, no.

Q     How have you seen him?

A      By recent mugshots in our RMS system.

[Defense counsel]: Objection as to the reference of mugshots and ask that it be stricken.

THE COURT: Well, counsel raised a foundational question. He can answer that question. Some public records?

[Deputy Gonzalez]: Yes, public records. I was able to obtain a photograph of [Brashear], which I did that night to try and figure out his identity.

Brashear requested a conversation outside the presence of the jury, in which he raised both this and the earlier reference to criminal history, and asked for an instruction striking the references from the record. The State argued "there is going to be a stipulation that he has a crime of—a conviction for a serious offense," and "I don't care if Your Honor wants to strike this particular thing from the record. But for the record from the State's understanding, there is no prejudice, because the jury is [going to] hear information." The trial court declined to strike the objectionable references from the record.

Fourth, Mourer testified she was worried "[b]ecause [Brashear] said he refused to go back to prison," so she did not meet officers at the end of the driveway. Brashear objected, and outside the presence of the jury, moved for a mistrial. The trial court denied the motion for a mistrial and declined to act on Brashear's objection.

Fifth, Clark County Sheriff's Detective Matthew Volker testified, "Initially, it was unclear if the defendant and/or [Mourer] were [in] that residence, but there was obviously concern for [Mourer's] safety. So, there—the house was basically cleared by our SWAT team, to make sure that nobody was inside." Detective

Volker further testified that SWAT does not get dispatched every time officers go to a case like that. Brashear did not object, and thus waived the issue.

Because of the trial court's resistance to Brashear's requests to order improper comments stricken, in none of these instances can we say "the trial court properly instructed the jury to disregard it." Thompson, 90 Wn. App. at 46. Thus, we confront an evidentiary record which the trial court allowed to go to the jury with numerous references to other acts by Brashear that were obviously inadmissible under ER 403 and ER 404(b), and that were excluded by the order in limine. The reference to the SWAT response had no identified relevance to the action but served only to improperly imply that Brashear was dangerous. Such references were not akin to a response to a challenge by the defense to the reliability of the State's investigation of Brashear's guilt. The first reference might have been technically responsive to the State's question about the procedure for executing a warrant, but the question could not have alerted defense counsel to a forthcoming reference to criminal history and the dangerousness implied in a SWAT response, and the purpose of motions in limine and of stipulating to relevant criminal history is to prevent such surprises from occurring. Allowing the references to the SWAT response and then refusing to strike them was error. The reference to "recent mugshots" was not cumulative given the age of the provable prior offense, as the trial court recognized from rephrasing the inquiry into one about "public records." And the trial court again erred by refusing to strike the improper testimony.

While the question is a close one, we decline to order a new trial. Ultimately, the question is whether the improper statements, when viewed against the

18

background of all the evidence, were so prejudicial that Brashear was denied a fair trial. To the extent these references indicated a generic criminal history or having been in prison, they were harmless in this case because the jury knew from jury selection that the State was accusing Brashear of having a prior conviction and the subsequent stipulation included in the final instructions indicated the prior conviction. The only extent to which these statements implied more was the extent to which they suggested more recent criminality. This was an implication at most, and was never directly indicated. In light of the deferential standard of review, we cannot say that the trial court's decision to deny a mistrial amounted to an abuse of discretion, and for the same reason the improper references do not justify a new trial.

Brashear further argues that defense counsel was ineffective in failing to contemporaneously object to all the improper testimony. To prevail on a claim of ineffective assistance of counsel the defendant must demonstrate that: (1) counsel's representation was deficient, meaning it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) the defendant was prejudiced, meaning there is a reasonable probability that the result of the proceeding would have been different but for the challenged conduct. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); McFarland, 127 Wn.2d at 334-35. If either prong has not been met, we need not address the other prong. State v. Garcia, 57 Wn. App. 927, 932, 791 P.2d 244 (1990).

Brashear fails to establish there was a reasonable probability that the outcome would have been different given the amount of evidence of Brashear's guilt regarding the second degree assault and unlawful possession of a firearm. Moreover, the jury's acquittal on four other counts indicates that it was not unduly swayed against neutrally weighing the evidence and being willing to acquit. Defense counsel was not ineffective in failing to object to the testimony.

V

Brashear argues the State engaged in prosecutorial misconduct by commenting on his guilt during cross-examination. We conclude the misconduct was not prejudicial.

During Brashear's cross-examination, he claimed the investigation was unfair because he was not given a chance to give his version of events. Later, he admitted he was given an opportunity to give a statement, but he added that when he offered to come in to the station, the police planned to have him arrested "no matter what." The State challenged this testimony by confronting Brashear with the fact he had absented himself from the scene of at least one of Mourer's claimed assaults, and the following testimony occurred:

Q       Why would he arrest you, if you did nothing wrong?

A       I didn't say I did nothing wrong. It's obvious that there was an assault on [Mourer] that night. Not an assault, but she was hurt. She was harmed. She went to the hospital.

Q       All right.

A       And I was fearful that I was going to be railroaded.

Q      Okay.  So, don't you think that it would be logical then, that you would want to leave with law enforcement?  That you would want to be present when they show up at the house, *so you don't look guiltier then you are by not being there.*

[Defense counsel]: Objection, Your Honor.  Motion to strike.

THE COURT: Rephrase the question, please.  Sustained.

(Emphasis added.)  Outside the presence of the jury, Brashear moved for a mistrial due to prosecutorial misconduct.  The trial court denied the motion.

In a prosecutorial misconduct claim, the defendant bears the burden of proving that the prosecutor's comments were both improper and prejudicial.  State v. Thorgerson, 172 Wn.2d 438, 442, 258 P.3d 43 (2011).  If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict.  State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009).

A prosecutor cannot use their position of power and prestige to sway the jury and may not express an individual opinion of the defendant's guilt, independent of the evidence actually in the case.  In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 706, 286 P.3d 673 (2012).  Many cases warn of the need for a prosecutor to avoid expressing a personal opinion of guilt.  E.g., State v. McKenzie, 157 Wn.2d 44, 53, 134 P.3d 221 (2006); State v. Dhaliwal, 150 Wn.2d 559, 577-78, 79 P.3d 432 (2003); State v. Stith, 71 Wn. App. 14, 21-22, 856 P.2d 415 (1993).

Here, the prosecutor's cross-examination was improper because it embedded in the question the prosecutor's own testimony that Brashear was guilty.  The State's argument on appeal that it was harmless because the

prosecutor was about to argue in closing that Brashear was guilty is unacceptable as a justification because the prosecutor was not entitled to argue with the witness instead of pursuing proper cross-examination, and even in argument the prosecutor would not have been entitled to offer their own opinion. However, the misconduct was not prejudicial because it did not have a substantial likelihood of affecting the jury's verdict. Brashear did not answer the question, and the trial court sustained the objection and instructed the prosecutor to rephrase. The jury was instructed that the attorney's statements were not evidence, and jurors are presumed to follow the court's instructions. In re Pers. Restraint of Phelps, 190 Wn.2d 155, 172, 410 P.3d 1142 (2018). We conclude this one instance of misconduct does not rise to the level justifying appellate relief.

VI

Brashear argues the State failed to prove Mourer had actual authority to consent to officers' warrantless searches of Brashear's property. We disagree.

A

The trial court held a CrR 3.6 hearing on Brashear's motion to suppress. The following testimony was elicited.

On October 27, 2021, Deputy Gonzalez was dispatched to Brashear's residence on a report of a possible assault. During the investigation, the deputy took a report of Mourer's injuries and learned Brashear and Mourer were associated with the address. The property contained a locked metal gate between the house and the road, and law enforcement had to walk around the gate to access the property. Deputy Gonzalez testified that Mourer gave law enforcement

permission to search the property. Deputy Gonzalez further testified that Brashear was not on the property at the time and "we were unable to locate him or get a hold of him" to ask for his consent to search. Deputy Gonzalez took photographs later marked as the State's exhibits 7-18. He found the door to a house on the property ajar, and took the photographs from standing outside. His trial testimony later explained that the photographs generally showed broken items, scenes of disturbance, and in several locations blood droplets.

On October 30, 2021, Deputy Gonzalez was dispatched to Brashear's property for an unknown medical problem. When he arrived at the metal gate, Deputy Gonzalez walked past it because "when we showed up there, we could hear two people talking or arguing with each other up the driveway," and based on his previous visit to the property, the deputy "had established probable cause to arrest [Brashear]." Deputy Gonzalez testified that as they approached, Mourer was walking down to them and told them that Brashear had departed. The deputy was about 70 yards from the gate and he could "actually see the house itself when I actually contacted [Mourer] because she had property that she was taking—she had her belongings with her that were on the driveway." Mourer had one or two "[t]ub boxes with clothing, bags with clothing," and "a backpack." Officers did not have a warrant to search the property. Deputy Gonzalez testified that "[t]he way [Mourer] indicated, she pointed in the direction" Brashear had gone, and "it was non-verbal to me that we could search the property for [Brashear]." Deputy Gonzalez testified that he placed Mourer in an ambulance, and began searching

for Brashear with a K-9 unit. Officers did not locate Brashear, but did locate a firearm on a bench outside of the vacant home located on the property.

Mourer testified that law enforcement asked for permission to search the property on October 27 and she affirmatively gave them permission. Mourer testified that on October 30, she was again contacted by law enforcement. Mourer testified that on that day, she was hiding in the bushes and felt that she "couldn't get to the bottom of the property." Mourer testified she did not go to the bottom of the property because she was "in fear of the cops getting shot," because Brashear "said he's not going back to prison. It'll be a shootout before he goes back to prison." Mourer confirmed law enforcement asked for, and she gave, her permission to search the property on October 30.

Mourer testified she had been staying at Brashear's property "on and off for months," and would stay there five nights a week. Mourer testified she had permission to spend the night at Brashear's house because "[h]e brought me there," and "I don't drive. So, that's the only way I could get there is if he picked me up." Out of 30 days, Mourer would stay the night "at least a good 25" nights in a row. Before October 27, Mourer had been staying at the property for over two weeks. "[H]alf of [her] apartment" was at the property. Mourer had access to the outside of the property, including access to the keys to Brashear's truck, the house, and the locked gate because the keys were kept in the truck. Mourer testified Brashear "did hand me the keys one or more than one time. He told me what every key belonged to," and "[h]e said if something happened to him or he went somewhere that this is—he told me what all the keys are for specifically and to if—

24

and I would have to give them to his son or something." Mourer testified that she stayed on the property occasionally when Brashear was not present.

Brashear testified Mourer did not live with him but instead lived in an apartment that he helped her move into. Brashear testified he and Mourer dated "off and on" for about seven months and Mourer would stay on the property "maybe three nights a week." Brashear testified that he "stayed the night at her apartment I think four—four nights," in the seven months they were dating.

B

Brashear challenges finding of fact 4, which states,

Mourer felt she could not meet law enforcement outside of the gate because she was fearful of the defendant. She felt she needed to hide in the bushes and that she couldn't make it to the bottom of the property.

This finding is supported by Mourer's testimony she did not go to the bottom of the property because of fear of a shootout, and so hid in the bushes. Substantial evidence supports this finding.

Brashear challenges finding of fact 5, which states,

Once on the property law enforcement heard two people arguing with each other. Mourer walked to them and said that the defendant had run off. She pointed in the direction that he ran and gave law enforcement permission to search the property for him. She had her belongings in the driveway, [which] included one or two tub boxes filled with clothing, bags of clothing, and a backpack. Mourer was placed into an ambulance and left the property.

Deputy Gonzalez testified that he heard "two people talking or arguing with each other up the driveway," and Mourer was walking down to them and told them that Brashear had departed. Deputy Gonzalez testified that Mourer "pointed in a

25

direction" Brashear had taken, and Mourer testified law enforcement asked for consent to search the property, and she said yes. Deputy Gonzalez testified Mourer had one or two "[t]ub boxes with clothing, bags with clothing," and "a backpack," and he walked her to the ambulance. Substantial evidence supports this finding of fact.

Brashear challenges finding of fact 8, which states,

Prior to contact with law enforcement, Mourer had been living with the defendant at the 391st Street address. She and the defendant were in a dating relationship and Mourer had recently been living at the address for about three to four weeks. In total, lived at the address on and off for about seven months and had been staying there about three to five nights per week. Half of her belongings were on the property. The defendant had to transport her to the address as she did not drive. She had access to the property, including the keys to his truck, the house, and the gate. Mourer stayed on the property on occasion when the defendant was not present.

Mourer testified that prior to contact with law enforcement she had been staying at the property. She had been staying there "on and off for months," and would stay there five nights a week. "[H]alf of [her] apartment" was at the property. Because Mourer did not drive, Brashear drove her there. She had access to the outside of the property and access to the keys to Brashear's truck, the house, and the locked gate. She also stayed on the property occasionally when Brashear was not present. Substantial evidence supports this finding of fact.

C

Brashear challenges conclusion of law 1, which states,

Law enforcement entered the property under exigent circumstances given the nature of the dispatch and the nature of the assault from three days earlier.

Unchallenged finding of fact 1 states law enforcement was dispatched to Brashear's residence on October 27, 2021 on a report of a possible assault and Deputy Gonzalez took a report of Mourer's injuries.  Unchallenged finding of fact 3 states Deputy Gonzalez was dispatched to the same location on October 30 for an unknown medical problem.

Warrantless entry onto the premises in response to a 911 call, or a report of someone needing assistance, is justifiable under the emergency aid exception.  E.g., State v. Johnson, 104 Wn. App. 409, 412, 16 P.3d 680 (2001) (domestic violence report); State v. Leupp, 96 Wn. App. 324, 326, 980 P.2d 765 (1999) (911 hang up call); State v. Menz, 75 Wn. App. 351, 352, 880 P.2d 48 (1994) (domestic violence report).  The findings of fact support this conclusion of law.

Brashear challenges conclusions of law 3 through 6, which state,

3.   Mourer gave law enforcement consent to search the property.
4.   Mourer had actual authority to provide such consent as she was a co-habitant of the property.
5.   Law enforcement were legally on the premises when they found the firearm because of Mourer's consent.
6.   The firearm is admissible.

Under article I, section 7 of the Washington Constitution, warrantless searches are per se unreasonable.  State v. Hendrickson, 129 Wn.2d 61, 70, 917 P.2d 563 (1996), overruled on other grounds by Carey v. Musladin, 549 U.S. 70, 127 S. Ct. 649, 166 L. Ed. 2d 482 (2006).  Article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law."  One exception to the warrant requirement is consent to search, and it is the State's burden to establish that consent was lawfully given.  State v. Thompson, 151

27

Wn.2d 793, 803, 92 P.3d 228 (2004). In search and seizure cases involving cohabitants, Washington has adopted the common authority rule. Id. at 804.

Article I, section 7 of the Washington Constitution provides greater protection of individual privacy than the Fourth Amendment. State v. Morse, 156 Wn.2d 1, 10, 123 P.3d 832 (2005). Under article I, section 7, whether a person can consent to the search of a premises is based upon that person's independent authority to so consent and the reasonable expectation of their co-occupant about that authority. "First, a consenting party must be able to permit the search in his own right. Second, it must be reasonable to find that the defendant has assumed the risk that a co-occupant might permit a search." State v. Mathe, 102 Wn.2d 537, 543-44, 688 P.2d 859 (1984). "In essence, an individual sharing authority over an otherwise private enclave inherently has a lessened expectation that his affairs will remain only within his purview, as the other cohabitants may permit entry in their own right." State v. Leach, 113 Wn.2d 735, 739, 782 P.2d 1035 (1989). The test for the authority to consent is as follows:

> The touchstone of the inquiry is that the person with common authority must have free access to the shared area and authority to invite others into the shared area. That access must be significant enough that it can be concluded that the nonconsenting co-occupant assumed the risk that the consenting co-occupant would invite others into the shared area. When a guest is more than a casual visitor and has "run of the house," her lesser interest in the property is sufficient to render consent to search effective only as to the areas of the home "where a visitor would normally be received."

Morse, 156 Wn.2d at 10-11 (internal quotation marks omitted) (quoting 4 WAYNE R. LaFAVE, SEARCH & SEIZURE § 8.5(e), at 235 (4th ed. 2004))

Here, Mourer was "more than a casual visitor" as Brashear's girlfriend and her testimony supports that the part of the premises Brashear had made available to her as her dwelling included at least the exterior grounds of the property where the gun was found and the open door through which police viewed the interior of the residence. Mourer and Brashear were in a relationship, and Mourer had been living at Brashear's residence on and off for about seven months, about three to five nights a week. Mourer was a regular co-habitant on the property and thus had independent authority to consent to a search of the property. It is reasonable to conclude Brashear assumed the risk that Mourer would consent to a search, as he allowed her to stay on the property while he was away, he allowed her access to the house and gate keys, and the search arose out of her emergency call that he had assaulted her at the property while she was residing there.

Brashear takes out of context the court's discussion in Thompson to argue that it was necessary to show not merely that Mourer had authority to allow these particular searches, but that she had "equal control over the premises." In Thompson, Thompson lived on a trailer on part of his parents' land, and stored some items in a boathouse on another part of the land. 151 Wn.2d at 806. Thompson's father authorized a search of the boathouse. Id. at 799. Thompson relied on the rule that if a cohabitant is present and able to object, the police must "also" obtain the cohabitant's consent to search—where a cohabitant is defined as a person having "equal control over the premises." Id. at 804-05. The court held that by merely storing some items in the boathouse, Thompson did not enjoy equal control as the owner and so it was not necessary to also obtain his consent to

29

justify a search of the boathouse.  Id. at 805-06.  But Thompson did not hold that "equal" authority must exist to give consent for any search, and Morse contradicts that assertion by acknowledging that a guest might have the ability to permit a search of common areas but not private areas in which the guest was not normally received.  Morse, 156 Wn.2d at 11.  As a regular inhabitant of the property as Brashear's girlfriend, Mourer had at least the authority described in Morse to allow the searches of the property grounds in which she was normally received.

Conclusions of law 3 through 6 are supported by the trial court's findings of fact.  Mourer had actual authority to consent to the search of the property.

VII

Brashear argues the errors are prejudicial in the aggregate.  We disagree. Cumulative error may warrant reversal, even if each error standing alone would otherwise be considered harmless.  State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  However, the doctrine does not apply where the errors are few and have little or no effect on the outcome of the trial.  Id.  Because the errors are few and had no effect on the outcome of the trial, we reject Brashear's cumulative error argument.

VIII

Brashear argues the trial court erred by failing to order and review a presentence report authored by the department of corrections, which he claims was required by the MHSA statute.  We disagree.

Trial courts have "considerable discretion" when determining whether an alternative sentence is appropriate.  State v. Hender, 180 Wn. App. 895, 900-01,

324 P.3d 780 (2014). A court that fails to consider a requested alternative abuses its discretion. State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). There are four eligibility requirements to be sentenced under the MHSA statute:

> (a) The defendant is convicted of a felony that is not a serious violent offense or sex offense;
> (b) The defendant is diagnosed with a serious mental illness recognized by the diagnostic manual in use by mental health professionals at the time of sentencing;
> (c) The defendant and the community would benefit from supervision and treatment, as determined by the judge; and
> (d) The defendant is willing to participate in the sentencing alternative.

RCW 9.94A.695(1). The trial court may rely on mental health services reports to determine whether a defendant had a serious mental illness. RCW 9.94A.695(2). To assist the trial court in its determination, the department of corrections "shall" provide a written presentence investigation report, however, the trial court "may waive the production of this report if sufficient information is available to the court to make a determination under subsection (4) of this section." RCW 9.94A.695(3). Subsection four reads, in relevant part, "After considering all available information and determining whether the defendant is eligible, the court shall consider whether the defendant and the community will benefit from the use of this sentencing alternative." RCW 9.94A.695(4).

In its denial of the MHSA request, the trial court referenced Brashear's pattern of "grooming and predation" and patterns of "isolation and financial dependence and other dependence on him" which the trial court did not believe to be accidental. The trial court further stated it believed it stood "at the zenith of its authority and power when it's protecting those that are vulnerable in the

community." Moreover, the record contains no indication that at the time of sentencing Brashear had ever been diagnosed with a serious mental illness triggering eligibility for the sentencing alternative. Based on the trial court's view of the evidence, it concluded that the community would not benefit from granting the MHSA request. The trial court did not abuse its discretion in declining to order a presentence investigation report.

IX

Brashear argues the trial court erroneously imposed the VPA and the community custody supervision fees. The State concedes remand is appropriate to strike the imposition of both fees. We accept the State's concession and remand for both fees to be stricken as a ministerial matter.

X

In his statement of additional grounds, Brashear amplifies the above arguments and further asserts numerous claims regarding prosecutorial misconduct, judicial misconduct, and ineffective assistance of counsel. We have considered Brashear's arguments that the prosecutor engaged in misconduct by (1) bringing to the trial court's attention outside the presence of the jury Mourer's uncharged rape allegation with a request to instruct Mourer to not mention it during her testimony, (2) allegedly violating conditions of the omnibus agreement by producing new (unidentified) discovery, (3) amending the information to add an additional charge of fourth degree assault before trial, (4) allowing Mourer to testify with an allegedly active arrest warrant, and (5) allegedly misstating the evidence of Mourer's residential alternatives during sentencing, that the trial court erred by

(6) violating his right to a speedy trial, (7) reading the amended information to the jury venire which included the State's allegation that Brashear had a prior conviction, (8) failing to take corrective action when a juror was overheard discussing jury selection on the phone, and the parties agreed on taking no action, (9) requesting that Deputy Gonzalez say "public records" instead of "recent mugshots" (discussed above), (10) denying a motion for mistrial (discussed above), (11) admitting evidence of Brashear's suicidal threats but not admitting evidence of Mourer's "similar behavior," (12) failing to rule on Brashear's motion to strike the "recent mugshots" comment where the court redirected the testifying witness (discussed above), and (13) admitting Mourer's statements to Detective Volker made the day after the night of October 30-31, 2021, under the "excited utterance" exception, and that Brashear's counsel was ineffective in failing to (14) contemporaneously object to an officer referring to Mourer as a "victim," (15) timely file a motion to sever counts (which was later withdrawn), (16) file a motion to dismiss charges based on a speedy trial violation, (17) call Mourer's mother to testify, (18) subpoena ambulance records and Mourer's phone records, (19) decline a stipulation with the State,[8] (20) object to the trial court violating Brashear's right to confer with counsel, (21) make the trial court aware of the State's alleged omnibus violations, (22) move for a new jury panel, (23) object to the prosecutor's alleged misstatements of Mourer's residential alternatives during

---

[8] Although not identified by Brashear, it is clear he is referring to the stipulation concerning his 2011 conviction.

sentencing, and (24) impeach Deputy Gonzalez and Mourer. We have concluded that these claims lack merit.

We affirm Brashear's conviction, and remand to allow the trial court to strike the VPA and the community custody supervision fees as a ministerial matter.

Birk, J.

WE CONCUR:

Feldman, J.                    Díaz, J.